## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

HILLERY McGOWEN,

        **Plaintiff,**

vs.                                                                Case No.: 5:04cv51/MCR

GORDON R. ENGLAND,
in his official capacity as Secretary of the Navy,
UNITED STATES NAVY,

        **Defendant.**

_____/

### FINAL JUDGMENT

In this case plaintiff Hillery McGowen ("McGowen") sues defendant Gordon R. England in his capacity as Secretary of the Navy ("the government") pursuant to the Age Discrimination in Employment Act ("ADEA"), 42 U.S.C. § 621, et seq.  The court tried the matter without a jury in a two-day trial[1] and took under advisement the government's motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 52(c).[2]  The court has considered all of the testimony and evidence presented at trial, as well as the pleadings, memoranda, and argument of counsel. (Docs. 1, 6, 28, 29, 30, 31, 32, 38, 39, 40, 41, 42).

---

[1]    The ADEA does not provide for a jury trial in cases in which the employer is the federal government. See 29 U.S.C. § 633a; Lehman v. Nakshian, 453 U.S. 156, 165 (1981).

[2]    The government moved for judgment as a matter of law pursuant to Rule 52 at the close of McGowen's case and renewed its motion at the close of all the evidence. The court instructed the government to file a written memorandum on its motion within thirty days and McGowen to file a response, which they have now done. (Docs. 40, 41). In addition, as directed by the court, the parties have made their closing arguments in writing.  (Docs. 39, 42).  The trial was recorded by a court reporter but no official transcript has been requested or filed.

As set forth below, the court concludes that McGowen has failed to establish by a preponderance of the evidence his claims of age discrimination and retaliation. Accordingly, the government's renewed Rule 52(c) motion for judgment as a matter of law is GRANTED and McGowen's claims are DISMISSED with prejudice.

## ADMISSIBILITY OF GOVERNMENT'S EXHIBITS 16 & 22

At trial the court deferred ruling on the admissibility of two exhibits, Government's Exhibit 16 (the decision dated May 16, 2003, of the administrative law judge on McGowen's Equal Employment Opportunity ("EEO") complaint) and Government's Exhibit 22 (the Department of the Navy's final order dated June 30, 2003, on McGowen's EEO complaint). At trial McGowen objected to the admission of these items on the ground of lack of authentication, while in the pretrial stipulation he objected to their admission solely on the basis of relevance. (See pretrial stipulation, doc. 24, ¶ D(II)(2)).

The documents shall be admitted. As an initial matter, McGowen waived his authentication objection to these items by failing to raise it prior to trial. (See pretrial order, doc. 20, ¶ III(D), stating that "any objections not listed will be deemed waived."). Furthermore, the documents are admissible under Fed.R.Civ.P. 901(b)(4). The internal characteristics of the EEO decision and the Navy's final order relating to that decision are sufficiently distinctive to be indicative of their origins, particularly when considered in connection with the circumstances external to them, including their references to persons, events, and places that are corroborative of other testimony in the record. See United States v. Kandiel, 865 F2d 967, 973-73 (8th Cir. 1989). The court finds that there is evidence sufficient to support a finding that the documents are what the government claims them to be and that they should be admitted. See Fed.R.Civ.P. 901(a); see also United States v. Caldwell, 776 F.2d 989, 1000 (11th Cir. 1985) (stating that "[a]uthentication . . . under Rule 901 merely involves the process of presenting sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be. Once that prima facie showing has been made, the evidence should be admitted, although it remains for the trier of fact to appraise whether the proffered evidence is in fact what it purports to be."). Finally, the court recognizes that "[i]n this circuit, it is well established that EEOC

determinations are generally admissible in bench trials," <u>Walker v. NationsBank of Florida, N.A.</u>, 53 F.3d 1548, 1554 (11th Cir. 1995) (citation omitted), and it finds that the documents at issue in this case contain relevant factual information.[3]   For these reasons, Government's Exhibits 16 and 22 are admitted into evidence.[4]

## LEGAL STANDARDS

### Age Discrimination in Employment Act

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1).  Under the ADEA as applied to the federal government and its agencies, "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a); § 631(b) (providing that all federal employees who are least forty years of age are considered protected employees under the ADEA).

Under the ADEA the plaintiff may prove a claim of discrimination through (1) direct evidence, (2) circumstantial evidence, or (3) statistical proof. <u>See</u> <u>Earley v. Champion International Corp.</u>, 907 F.2d 1077, 1081 (11th Cir. 1990); <u>see also</u> <u>Damon v. Fleming Supermarkets of Florida, Inc.</u>, 196 F.3d 1354, 1358 (11th Cir. 1999). "[D]irect evidence is 'evidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption.'" <u>Akouri v. State of Florida Department of Transportation</u>, 408 F.3d 1338, 1347 (11th Cir. 2005) (<u>quoting</u> <u>Burrell v. Board of Trustees of Georgia Military College</u>, 125

---

[3] "Administrative findings regarding claims of discrimination are admissible in a trial <u>de novo</u> under Federal Rules of Evidence 803(8)," the exception to the hearsay rule for reports of public agencies. <u>Id.</u>, n.7 (citation omitted).

[4] As the fact finder in this case, the court is satisfied that Government's Exhibits 16 and 22 may be fully credited as actually being what the government submits they are.  Nevertheless, although they are useful in providing some factual background information, the court finds that the exhibits are of minimal probative value; indeed, they have had no bearing on its disposition of the merits of this case.  Moreover, no prejudice can accrue from consideration of the documents by this court sitting without a jury.

F.3d 1390, 1393 (11th Cir. 1997)).[5]  The standard for direct evidence is rigorous, however, as "[e]vidence that only suggests discrimination . . . or that is subject to more than one interpretation" is not sufficient.  Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir. 1997).

When the plaintiff seeks to rely on circumstantial rather than direct evidence to prove his discrimination claim, the analysis is guided by the framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); see also St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); Kelliher v. Veneman, 313 F.3d 1270, 1275 (11th Cir. 2002).  Under this framework, the plaintiff may establish a prima facie case of discrimination based on disparate treatment by showing that he was "(1) a member of the protected class; (2) qualified for the position; (3) subjected to adverse employment action; and (4) replaced by a person outside the protected class or suffered from disparate treatment because of membership in the protected class." Kelliher, 313 F.3d at 1275; Chapman v. A1 Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). To show that he suffered an adverse employment action, the plaintiff must demonstrate that he experienced "a serious and material change in the terms, conditions, or privileges of employment." Davis v. Town of Lake Park, Florida, 245 F.3d 1232, 1238 (11th Cir. 2001).

The Eleventh Circuit has not explicitly decided whether claims for a hostile work environment based on age discrimination are actionable under the ADEA. See Hipp v. Liberty National Life Insurance Co., 252 F.3d 1208, 1244-45 and n.80 (11th Cir. 2001).  If such claims are actionable, using the framework for assessing Title VII claims to establish a prima facie case the plaintiff must allege that (1) he belongs to a protected group; (2) he has been subjected to harassment; (3) the harassment was based on a protected

---

[5] "An example of direct evidence would be a management memorandum saying, Fire Earley – he is too old." Damon, 196 F.3d at 1358-59 (citing Earley, 907 F.2d at 1082, in holding that direct evidence "must indicate that the complained-of employment decision was motivated by the decision-maker's ageism") (emphasis in original).

characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) there a legal basis exists for holding the employer liable. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002); Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).

The standard for establishing constructive discharge is more stringent than the standard for proving a hostile work environment. Hipp, 252 F.3d at 1231. The plaintiff can prove a claim of constructive discharge, which is "[a]nother variation of age discrimination, Castle v. Sangamo Weston, Inc., 837 F.2d 1550, 1559 (11th Cir. 1988), by demonstrating that working conditions were "so intolerable that a reasonable person in [his] position would have been compelled to resign." Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir. 1997) (internal quotation marks and citation omitted).  As claims of constructive discharge are evaluated using an objective standard, the plaintiff's subjective feelings about his working conditions are not a factor in the court's consideration.  Doe v. DeKalb County School District, 145 F.3d 1441, 1450 (11th Cir. 1998).  Constructive discharge qualifies as an adverse employment decision. Maddow  v. Procter & Gamble, 107 F.3d 846, 852 (11th Cir. 1997).

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a "legitimate, nondiscriminatory reason for its actions." Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1432 (11th  Cir. 1998).  This burden is one of production rather than persuasion, Perryman v. Johnson Products  Co., 698 F.2d 1138, 1142 (11th  Cir. 1983), and the proffered justification need only be one that "might motivate a reasonable employer." Chapman, 229 F.3d at 1031.  If the defendant articulates such a reason, the burden shifts back to the plaintiff, who must then establish that the employer's reason was a "pretext to mask unlawful discrimination." Turlington, 135 F.3d at 1432.  At this final step, the plaintiff carries the "ultimate burden of establishing by a preponderance of the evidence that a discriminatory intent motivated the employer's action." Perryman, 698 F.2d at 1142.

The principles applicable to claims of discrimination also generally apply to  claims of retaliation under the ADEA. To establish a prima facie case of retaliation, a plaintiff must

show: (1) that he engaged in protected activity; (2) that he was subsequently subjected to adverse employment action; and (3) that a causal link existed between the two events. Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002); see also Bass,  256 F.3d at 1117; Gupta v. Florida Board of Regents, 212 F.3d 571, 587 (11th Cir. 2000). "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct [and] that the protected activity and the adverse employment action were not wholly unrelated." Gupta, 212 F.3d at 590 (internal quotations and citation omitted). If the plaintiff makes such a showing, the defendant has the burden of producing some legitimate, nonretaliatory reason for its actions.  Bass, 256 F.3d at 1119. Upon the defendant's producing such a reason, the plaintiff must then establish that the employer's proffered reasons for its actions were a pretext for the retaliatory conduct. Sullivan v. National R.R. Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999).

### Federal Rule of Civil Procedure 52[6]

The appropriate procedural mechanism for dismissal in a bench trial is a motion pursuant to Rule 52(c).[7]  In considering such a  motion, the court acts not only as judge but also as the  finder of fact.  Accordingly, the court may resolve conflicts in the evidence and make credibility determinations.  See Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d

---

[6]  Federal Rule of Civil Procedure 52 in pertinent part provides:
(a) Effect.  In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58 . . . . Requests for findings are not necessary for purposes of review.  Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. . . . It will be sufficient if the findings of fact and conclusions of law are stated orally and recorded in open court following the close of the evidence or appear in an opinion or  memorandum of decision filed by the court.

(c) Judgment on Partial Findings.  If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.  Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

[7]  The corresponding rule for a jury trial is Federal Rule of Civil Procedure 50(a).

1500, 1504 (11th Cir. 1993) (applying former Rule 41(b) but noting that relevant language had been removed when rule was amended and placed in Rule 52(c));[8] Stearns v. Beckman Instruments, Inc., 737 F.2d 1565, 1568 (Fed. Cir. 1984).  Rule 52(a) requires a district court sitting without a jury to make findings of fact and conclusions of law  and to do so with enough specificity for a reviewing court to identify those factual findings upon which the court's legal conclusions are based.  See Feazell v. Tropicana Products, Inc., 819 F.2d 1036, 1041-42 (11th Cir. 1987).  The rule does not, however, require the court to make a finding on every contention raised by the parties.  Id.  The court should "evaluate the evidence without making special inferences in the plaintiff's favor . . . and [should] resolve the case on the basis of preponderance of the evidence."  Emerson Electric Co. v. Farmer, 427 F.2d 1082, 1086 (5th Cir. 1970)[9]; Grant v. Bullock Board of Education, 895 F.Supp. 1506, 1509 (M.D.Ala. 1995).   "[I]f the judge determines, after weighing the evidence, that the plaintiff has not established a claim for relief, the motion for a judgment on partial findings may be granted even if the plaintiff has established a prima facie case."  Cherrey v. Thompson Steel Co., Inc., 805 F.Supp. 1257 (D.Md.1992); see also Martinez v. U.S. Sugar Corp., 880 F.Supp. 773, 775 (M.D.Fla.1995) (citing Cherrey).  "In ruling on a renewed motion to dismiss at the close of all the evidence, the trial court is entitled to take into consideration all evidence presented both before and after the initial motion to dismiss at the close of the plaintiff's evidence."  Wealden Corp. v. Schwey, 482 F.2d 550, 552 (5th Cir. 1973) (applying former Rule 41(b) and citing 9 Wright and A. Miller, Federal Practice and Procedure, § 2371 (1971)).

        In accordance with the requirements of Rule 52, the court enters the following findings of fact and conclusions of law.

---

        [8]  Case law construing the former Rule 41(b) is equally applicable to Rule 52(c). See 9A Charles Alan Wright & Arthur R. Miller, Federal Practice And Procedure  § 2573.1 at 494 (2nd ed. 1995).

        [9]  Decisions of the former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th  Cir. 1981) (en banc).

**Findings of Fact**

1.      McGowen's date of birth is April 30, 1938, and he was over forty years of age at all times relevant to the events giving rise to his complaint.

2.       McGowen was employed as a physicist by the U. S. Navy from 1964 until October 2001 and worked at the Coastal Systems Station ("CSS"), a research laboratory which is located in Panama City, Florida.  CSS' stated mission is to support the Navy and Marine Corps by providing research, development, test and evaluation, and engineering services to the fleet.

3.      CSS underwent review by the Base Realignment and Closure ("BRAC") committee during the mid-1990s, and CSS management expected additional reviews in subsequent years.  CSS had no plans to reduce the number of its employees in anticipation of any possible recommendation by the BRAC committee to close CSS or to cut back its operations.

4.      In approximately 1997 CSS conducted a study to gather statistics about the demographics of its organization.  The study indicated that the median age of CSS' scientists was approximately fifty-four years.[10]

5.      McGowen received an overall work performance evaluation for the period August 1996 through July 1997 of "exceeds fully successful."[11] (Government's Exh. 2).  In August 1998 McGowen was nominated to receive an award in recognition of his outstanding scientific achievements and contributions to CSS.  (Plaintiff's Exh. 2).

6.      In approximately 1998, as part of an effort to "downsize" management positions in

---

[10]  McGowen's former division head, Kirk Dye ("Dye"), testified the study revealed the median age was forty-six years of age, and McGowen testified it was fifty-four or fifty-six years of age.  Although the court finds both witnesses to be credible on this point, neither was certain of the figure(s) he cited and the study itself was not introduced as evidence.  Regardless, McGowen has failed to demonstrate any connection whatsoever between the median age of CSS' workers in 1997 and his claims of age discrimination, and thus this statistic makes no difference to the disposition of this case.  In any event, for the purpose of making its factual findings, the court shall accept that the 1997 study reflected that the median age of CSS scientists was approximately fifty-four years.

[11]  The rating choices on the form range from "unacceptable" (Level 1) to "outstanding" (Level 5).  Level 4 is denoted "[e]xceeds fully successful."

Washington, D.C., CSS was authorized to offer early retirement or separation to eligible civilian employees such as McGowen through programs known as VERA [Voluntary Early Retirement Authority] and VSIP [Voluntary Separation Incentive Pay].  Sixty or more CSS employees accepted the offers at that time and left government service but McGowen did not.

7.      The loss of sixty employees at approximately the same time created an acute shortage of experienced engineers to execute CSS' existing projects and develop future projects.   CSS therefore began hiring numerous new workers of all ages, including journeymen with significant work experience and those who were recent college graduates ("fresh-outs").

8.      CSS made  no plan or attempt to force older workers eligible for early retirement to accept VERA or VSIP in order to reduce the median age of its workforce.  It had no policy of hiring only younger workers or fresh-outs to replace older workers.

9.      Jim Thomsen ("Thomsen") served in 1998 as the department head of Code A, the Coastal Warfare Systems Department of CSS.   One of the five divisions Thomsen supervised in Code A was Code A-40, the Amphibious & Expeditionary Warfare division, which as of February or March 1998 was headed by Dye; within this division was Code A-42, the Ship Systems Branch ("Code A-42" or "the branch").  (See Government's Exh. 1).

10.     In October 1998 Code A-42 had been without a permanent manager for approximately one year. On a temporary, rotating basis senior engineers in the branch were assigned responsibility to serve as acting manager to perform administrative functions for Code A-42 but they did little in the way of performing supervisory functions.  Dye determined that the branch needed a permanent manager to unify the branch, in part because he envisioned restructuring Code A-40 and expanding its business base, including in the area of sea lift operations.[12]

11.     In October 1998 Laura Thompson ("Thompson") became the manager of Code A-

---

[12]  The EEO decision notes Dye's hearing testimony that because the branch manager position had been vacant for some time, Code A-42 needed tightened administrative oversight and accountability. (Government's Exh. 16 at 4).

42, after Dye selected her for the position and Thomsen approved the selection. McGowen was assigned to Code A-42 at the time of Thompson's selection as manager, and thus upon her transfer to the branch Thompson became McGowen's supervisor.

12.    Dye asked Thompson to develop and execute a plan in her branch to realize his goal of reorganizing the division and increasing its business. In response Thompson came up with a "team approach" plan whereby team leaders (also known as "project leaders") would be appointed to act as coordinators over multiple projects. In addition, the team leaders would work together as "thrust" leaders in an effort to implement the plan from a broader, longer-term "mission" perspective rather than simply the perspective of individual projects.[13]   Dye approved Thompson's proposed plan.

13.    When Thompson became manager of Code A-42 she implemented stricter supervision of branch employees.[14] This included requiring them to provide more extensive and more accurate documentation with respect to project status and expense reports, time cards, travel vouchers, and other project management information.

14.    At the time Thompson took over as branch manager McGowen was not working on-base as he had been given permission to work at home following surgery. Thompson determined that authorization for the work-at-home arrangement had expired approximately one year earlier and had not been renewed. Thompson required McGowen to return to the branch office to work.

15.    Robert Teer ("Teer") was transferred to Code A-42 in October 1998. Teer was born on September 29, 1958, and thus was forty years of age at the time of his transfer. Teer

---

[13]  The EEO decision reflects Thompson's hearing testimony that CSS' focus was on performing the work on its projects "in-house" rather than using outside contractors. In addition, CSS was in the process of transitioning from research and development work to systems development work, which was consistent with the testimony given by Teer. (Government's Exh. 16 at 5-6).

[14]  As noted in the EEO decision, according to former acting manager Jim Arias, after Thompson became the permanent manager of Code A-42 the branch was more organized, and she began holding monthly meetings and regularly reviewing the project engineers' work. (Government's Exh. 16 at 5).

joined CSS in order to be the thrust leader for the branch's sea lift work.[15]  Teer had been with CSS since 1985 and had significant experience with implementation of technology into the fleet.  Unlike McGowen, whose recent background in testing at CSS had been limited to smaller projects, Teer's experience included projects which required extensive planning and execution, such as interface testing for large amphibious ships.

16.     CSS operates under a "working capital fund" system whereby its engineers are expected to create billing hours from their projects sufficient to assure that the facility's overhead and other expenses are adequately covered.  Under this system, projects are funded by a sponsor, which is typically a member of the fleet or a federal agency located in Washington, D.C.   Project engineers are, at least in part, responsible for finding sponsors as well as obtaining and tracking funding for their projects; in addition, project engineers are responsible for providing oversight, interfacing, and other services to the sponsors, such as engineering, development, testing, and certification services associated with the project.  Working under the project engineer is the systems engineer, who has less responsibility over the project as a whole.  The systems engineer generally is accountable for the technical aspects of the project rather than its financial aspects.

17.     In October 1998 Code A-42 had approximately twenty on-going projects.  McGowen was the project leader in charge of one of them, Project No. 22603, later known as Project ABC, which was a sea lift research and development project.

18.     After becoming branch manager Thompson frequently inquired of McGowen about administrative matters associated with Project ABC, such as information regarding sponsors, funding, and when deliverables were due.   McGowen was not able to provide the information Thompson requested and told her that he did not enjoy handling administrative matters, that they were not his area of focus or concern.[16]

---

[15]  The branch had three thrust leaders who were tasked with coordinating all projects in one of three specific areas: sea lift, ships, and sustainment or logistics.

[16]  Thompson also testified at the EEO hearing that despite CSS' efforts to transition to in-house systems development, McGowen's focus continued to be on research and technology work, doing demonstrations, and letting work to outside contractors.  (Government's Exh. 16 at 5).  Teer also testified that McGowen's focus remained on developing new technologies and that he resisted CSS' new focus and the

19.    As project engineer McGowen's cost estimates under the working capital fund system sometimes were too low. More specifically, McGowen's estimates did not fully cover his salary or other expenses of a project.

20.    One CSS former acting branch manager, Jim Arias, concluded that although McGowen was enthusiastic and very effective with respect to technical matters on his projects he was a poor administrator and tended to be disorganized.

21.    At a December 1998 meeting Thompson complimented McGowen for his contributions and service to CSS. She also advised him that Teer would soon be replacing him as the engineer in charge of Project ABC and made a comment to the effect she expected that McGowen would be retiring before too long.

22.    Thompson's determination that McGowen did not enjoy administrative duties and was not a good administrator, including that he often underbid proposals, influenced her decision to replace him with Teer as team leader of Project ABC.

23.    No other engineer at CSS had McGowen's technical expertise, knowledge, or experience regarding Project ABC. While outside contractors were knowledgeable about the project, there was an urgent need for in-house personnel to be trained to "back up" McGowen. In the past a CSS employee had been assigned to be mentored by McGowen on Project ABC, but the assignment was not successful and the employee asked to be relieved of the position.

24.    Because of a lack of adequate funding for Project ABC Thompson was unable to assign an employee to work under McGowen in order to become familiar with its operation. As the thrust leaders' salaries were paid from monies from other projects, however, Thompson was able to assign Teer to work on Project ABC.

25.    In January 1999 Teer assumed his role as the team leader for Project ABC, relieving

---

procedures which were designed to get the technology to the fleet. (Id. at 6).
        McGowen's inability to answer many of Thompson's questions about his projects caused Thompson to lose confidence in McGowen's ability to serve as project leader. Thompson decided that McGowen's strengths instead lay in the technical area as a systems engineer, a position in which he could oversee the engineering aspects of the project and be relieved of the management duties associated with it. (Id.).

McGowen of responsibility as project engineer. Thompson made McGowen the systems engineer for Project ABC, a reassignment which involved a significant change and diminution in duties, authority, and status for him but no reduction in pay or grade.[17]   Teer was not McGowen's supervisor but as team leader could offer guidance to McGowen regarding the project and set deadlines. In addition to serving as team leader, Teer was task leader for two of the five tasks involved in Project ABC.  McGowen was task leader for the remaining three tasks.[18]

26.    On March 5, 1999, Thompson sent McGowen a "Letter of Warning" regarding McGowen's conduct on the job since January 1999, when he was relieved of his project leader duties.[19]   In her letter Thompson stated that although McGowen had been specifically directed to coordinate with Teer before providing any cost estimates to outside entities, McGowen had directly e-mailed an estimate to Ingalls Shipbuilding Company without obtaining authorization. Thompson informed McGowen that she considered this conduct to be a willful and deliberate failure to carry out an order and that, if such conduct continued, would result in disciplinary action against him.  Thompson advised that in an effort to prevent future occurrences of what she considered unacceptable conduct, certain restrictions would be imposed on McGowen.  These restrictions included that McGowen's travel activities would be minimized and for any occasions when he was permitted to travel he must be accompanied by another employee; McGowen must never quote project or task costs and any request for estimates must be submitted to the project leader; e-mailed requests for information which McGowen received should be forwarded to the project leader; McGowen was no longer authorized to initiate stub requisitions for funding

---

[17] The reassignment had the potential indirectly to affect McGowen's ability to earn bonuses or salary increases; the latter could also possibly impact his retirement benefits.

[18] McGowen's tasks were the Tensioned Hose Refueling At Sea System, the Omni-Directional Vehicle, and the Universal Omni-Directional Telerobotic Transporter. Teer's tasks were the Improved Phone, Distance and Data Link and the Improved Fuel Fill Control System.

[19] The EEO decision reflects McGowen's testimony that at approximately the same time that Thompson sent McGowen the warning letter she angrily accused him, among other things, of being disloyal and untrustworthy. (Government's Exh. 16 at 7).

expenditures; and McGowen should not communicate with sponsors without project leader review. (Government's Exh. 13).  No other employees were subject to these restrictions.

27.     In July 1999 McGowen flew to the Washington D.C. area on a business trip for CSS with Teer.  While on the trip, McGowen, without the prior authorization or knowledge of Teer, met with a sponsor.

28.     As of July 1999 McGowen and certain other employees were working out of office space in trailers some distance from the branch's main building. Thompson instructed the employees to prepare to move from the trailers into the main building. Thompson and McGowen clashed over the length of time allotted McGowen to relocate his office, and she stated to McGowen that she would throw away any items he failed to timely remove from his trailer.  Although he was one of the last employees to make the move, McGowen eventually relocated from his trailer without incident.

29.     On several occasions, Thompson stated to McGowen in irritation that she and others would still be working at CSS long after McGowen had retired and was gone. Neither Thompson nor any other CSS employee or supervisor ever told McGowen that he ought to retire, although from time to time McGowen was asked about his retirement plans as CSS planned for its current and future staff needs.  Thompson felt that McGowen's sudden departure would be detrimental to Project ABC because no other CSS employee was adequately familiar with the technical aspects of the project.

30.     Teer completed and submitted to Thompson a Peer Review Worksheet for McGowen dated June 27, 1999.   In the Worksheet Teer recommended that McGowen receive no "pay-points," or bonus, for the review period October 1998 through September 1999 due to his failure to work well with the team.  (Plaintiff's Exh. 4).

31.     McGowen contacted Dye about his concerns over what he considered his deteriorating employment situation in early July 1999 and met with CSS' EEO officer on July 20, 1999.  Thompson met with the officer on August 3, 1999, regarding McGowen's employment concerns.

32.     In an evaluation dated August 26, 1999, Thompson assessed McGowen's work

performance for the period October 1998 to September 1999.[20] (Government's Exh. 3). McGowen's overall performance during the period was "acceptable"; more specifically, his overall performance rating was Level 1, "fulfills the requirements for position."[21] Thompson rated McGowen as Level 1 on all performance factors except one, which she rated as Level 2. With respect to the "position" rating component of the form, Thompson gave McGowen a Level 2 overall, "typical position for payband supporting strategic goals." Based on the August 1999 evaluation McGowen received a one-time single pay-point award of $808.00. (See Government's Exh. 4). Thompson considered McGowen to be a good engineer from a technical standpoint but felt that his organizational and administrative skills were poor. In her view, he was too often late or careless in submitting reports or other papers, including documents for tracking project expenses. Also, Thompson felt that McGowen needed to improve in the areas of focusing and organizing his work; concentrating on processes to move technology to the fleet; being more receptive to change and improving communications and relationships with co-workers; and being more open and willing to share pertinent project information with co-workers and management. Thompson's August 1999 evaluation, which was the worst of McGowen's career, reflected these assessments.

33.    Thompson prepared the evaluation dated August 26, 1999, prior to August 3, 1999, and Thompson first learned of McGowen's July 20, 1999, meeting with the EEO officer on August 3, 1999.

34.    On September 1, 1999, McGowen requested reconsideration of the August 1999 evaluation. (Government's Exh. 5).

---

[20]    McGowen's performance for the period August 1996 through July 1997 was assessed on a different form than the one used for the August 1999 evaluation. Indeed, a new performance evaluation format was used for engineers and scientists for the August 1999 evaluation, known as the Personnel DEMO.

[21]    Level 1 was the lowest of three levels from which the evaluator could select. Level 2 was described as "typical strong performance," and Level 3 was described as "extraordinary performance." Teer received a Level 3 overall review performance rating for the same period that McGowen received a Level 1 (Plaintiff's Exh. 5) and was awarded four "continuous" pay-points, the equivalent of a permanent yearly pay raise of approximately $3200.00.

35.      In a memorandum dated October 20, 1999, memorializing a meeting between Thompson, Teer, and McGowen, Thompson reminded McGowen that he must coordinate with Teer prior to arranging meetings or committing funding and noted that McGowen had been unresponsive to requests for information from Teer and herself.  (Plaintiff's Exh. 7). Thompson also stated that McGowen had been warned that if he did not comply with the chain of command he could be fired from the project and transferred to another code for reassignment.

36.      Thompson denied McGowen's request for reconsideration on November 9, 1999. (Government's Exh. 6).  Thompson failed to respond to the request within twenty days as required by the relevant regulations and thus her response was untimely.   Such untimeliness was due to Thompson's unfamiliarity with EEO deadlines as a new branch manager and her attention to other pressing branch business.

37.      On December 7, 1999, McGowen sought review of Thompson's decision by filing an appeal with Thomsen, who denied the appeal on January 7, 2000. (Government's Exhs. 7, 8, and 9).

38.      In a memorandum dated March 7, 2000, Thomsen summarized a March 3, 2000, meeting with McGowen, Dye, Thompson, and the EEO officer.  Thomson stated that he planned to find another position for McGowen within the organization which would utilize McGowen's expertise, but in a different code and under different supervision.

39.      McGowen filed a formal EEO complaint of discrimination on March 6, 2000. (Government's Exh. 15).

40.      On medical advice, McGowen went on extended sick leave starting in June 2000. He continued on this status until August 2001, when he returned to work because all of his leave had been exhausted.[22] Upon his return to CSS McGowen was transferred to a different code, where he was to work on his prior tasks at the same salary and grade but under a different supervisor.

_____

[22]  Approximately midway through this period McGowen made an unsuccessful attempt to return to work.  He worked less than one day before going back on sick leave.

41.     When McGowen returned to work in his new location he was assigned the largely clerical job of preparing a final accounting report for one of his former tasks, the Omni-Directional Vehicle.   This was a task which Teer had taken over after McGowen's departure and was then defunct.

42.     McGowen learned upon his return to work that he was subject to restrictions similar to those which had been imposed on him previously in Code A-42.  Finding the rules under which he was required to conduct himself at work unacceptable, McGowen elected to submit his retirement paperwork, with a note of protest regarding the circumstances.  He retired on October 3, 2001.  (Government's Exh. 20).

43.     In January 2003 an administrative hearing was held on McGowen's EEO complaint, with a written decision unfavorable to McGowen being entered May 16, 2003. (Government's Exh. 16). The Department of the Navy's final order was entered June 30, 2003.  (Government's Exh. 22).

44.     After the final agency decision was rendered, McGowen filed the instant action on March 2, 2004.  In his two-count complaint McGowen asserts that he was subjected to unlawful age discrimination and retaliation.  More particularly, the complaint alleges that McGowen was subjected to age discrimination when he was removed as leader of Project ABC and replaced with Teer; when he received the poor Personnel DEMO performance evaluation in August 1999; by being constructively discharged from the Navy when he retired in 2001; and through Thompson's creating a hostile work environment.  McGowen also complains that he was retaliated against for prior EEO activity when Thompson denied and did not timely respond to his request for reconsideration of the August 1999 evaluation.

### Conclusions of Law

1.     This is an action for age discrimination in employment under 29 U.S.C. § 621. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.[23]

---

[23] While the issue of the timeliness of the filing of the complaint is not jurisdictional, see Espinoza v. Missouri Pacific R. Co., 754 F.2d 1247, 1248, n.2 (5th Cir. 1985), there being no argument or evidence to the contrary the court concludes that the complaint was timely filed on March 2, 2004.

2.     At all times relevant to the events giving rise to the complaint in this case McGowen was protected by the provisions of the ADEA, and the government was subject to the requirements of the ADEA.

3.     McGowen has failed to establish his claims of age discrimination and retaliation by direct evidence. There is no evidence which proves the existence of a disputed fact without inference or presumption, i. e., no evidence which in fact indicates, not simply suggests, that ageism motivated any of the government's complained-of employment decisions. See Akouri, 408 F.3d at 1347, and Damon, 196 F.3d at 1358-59.

4.     McGowen has failed to establish a prima facie case of a hostile work environment by a preponderance of the circumstantial evidence.[24]  Although McGowen belongs to a protected group, he has failed to make the necessary showing that he suffered unwelcome harassment due to his age that was so severe or pervasive that it altered the terms and conditions of employment and created an abusive work environment.  Miller, 277 F.3d at 1275.  Thompson's strict management style, discussed in the court's factual findings, did not constitute harassment, much less harassment so severe or pervasive it created an abusive work environment. The same is true with respect to the employment conditions which McGowen experienced at his new assignment after returning from extended sick leave in August 2001.  Any conflicts that McGowen experienced with CSS management did not rise to the level required to establish a claim of a hostile work environment.  Rather those conflicts can more fairly be attributed to McGowen's own difficulties in adjusting to new and more demanding management, a different organizational structure, and a change in business focus at CSS.

5.     McGowen has failed to establish a claim of constructive discharge by a preponderance of the circumstantial evidence.  As an initial matter, because "[the standard for proving constructive discharge is higher than the standard for proving a hostile work environment," Hipp, 252 F.3d at 1231, and because McGowen has failed to meet even the

---

[24]  The court proceeds in this case under the assumption that claims for a hostile work environment based on age discrimination under the ADEA are actionable in the Eleventh Circuit. See Hipp, 252 F.3d at 1244-45 and n.80.

standard for a hostile work environment, he therefore cannot meet the higher standard for constructive discharge.  There are additional reasons for concluding that McGowen has failed to establish his claim of constructive discharge.  Even if McGowen took an extended leave for medical reasons, he has not proven that his work environment was responsible for any serious degradation in his health status. Moreover, McGowen did not retire until October 2001, which was some fourteen months after last working for Thompson in Code A-42.  This lack of temporal proximity alone is sufficient to cast significant doubt on any causal connection between McGowen's employment at Code A-42 and his decision to leave government service. Furthermore, after returning from his extended sick leave McGowen worked fewer than two weeks at his new assignment in a different branch, and there is no evidence that he made any effort to make management aware of his dissatisfaction there.  Constructive discharge will generally not be found if employer is not given sufficient time to remedy situation.  See Kilgore v. Thompson & Brock Management, Inc., 93 F.3d 752 (11th Cir. 1999).  In short, Thompson's conduct and comments did not create employment conditions for McGowen which were so intolerable that a reasonable person in his position would have felt compelled to resign. Poole, 129 F.3d at 553. Nor were the employment conditions to which McGowen was subjected at his new assignment so intolerable that a reasonable person would have quit.  Rather, in leaving government service in October 2001 McGovern voluntarily retired.

6.     McGowen has failed to establish a prima facie case of retaliation by a preponderance of the circumstantial evidence.

       a.     McGowen's informal complaint of discrimination made to the EEO officer on July 20, 1999, constitutes protected activity. See Rollins v. Florida Department of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989) (internal complaints of discrimination are statutorily protected conduct).

       b.     McGowen was subsequently subjected to adverse employment actions in the form of the poor performance evaluation dated August 26, 1999, and the denial of the request for reconsideration dated November 9, 1999.

       c.     McGowen has failed to establish a causal link between his July 20, 1999,

informal EEO complaint and the August 26, 1999, performance evaluation. Thompson actually prepared the evaluation prior to August 3, 1999, and at that time she was not aware that McGowen had met with the EEO officer on July 20, 1999.   McGowen therefore has not shown that Thompson knew of  the protected conduct when the adverse action took place or that his informal complaint and the evaluation "were not wholly unrelated." Gupta, 212 F.3d at 590.  McGowen has also failed to establish a causal link between his July 20,1999, informal EEO complaint and Thompson's tardy response to his request for reconsideration of the performance evaluation on November 9, 1999.  Although McGowen has shown that Thompson was aware of the protected conduct when the adverse action took place on November 9, he has not shown that the complaint and the untimely response "were not wholly unrelated." Gupta, 212 F.3d at 590.   Rather, the two events were unrelated as the late response was due to Thompson's unfamiliarity with EEO deadlines and her attention to other urgent branch business.

7.     McGowen has established a prima facie case through circumstantial evidence with respect to his claim of unlawful age discrimination. See Kelliher, 313 F.3d at 1275.

    a.     McGowen was a member of the class protected by the ADEA.

    b.     McGowen was qualified for the positions of project engineer and systems engineer of Project ABC.   See Damon, 196 F.3d at 1360 (finding that an employee's having held a position for a number of years and received awards and merit raises allows the inference that he was qualified for the job he performed).

    c.     McGowen was replaced as Project ABC's project engineer by Teer, who was a substantially younger employee.  See Turlington, 135 F.3d at 1432 (discrimination outside of the class of persons over the age of forty years is not a requirement under the ADEA if an older plaintiff is able to show discrimination in favor of someone substantially younger); see also Chapman , 229 F.3d at 1024 (indicating that a plaintiff may inferentially state a claim of disparate treatment under the ADEA by alleging he was replaced by a younger person).

    d.     McGowen suffered adverse employment actions through being relieved of his position as project engineer of Project ABC and receiving a poor performance

evaluation in August 1999.

i.      McGowen  experienced "a serious and material change in the terms, conditions, or privileges of employment" when he was replaced by Teer as project leader of Project ABC.  Davis, 245 F.3d at 1238; see also Gupta, 212 F.3d at 587 ("An adverse employment action is an ultimate employment decision . . .  that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." '); also see Stavropoulos v. Firestone, 361 F.3d 610, 620 (11th Cir. 2004), cert. denied, ___ U.S. ____, 125 S.Ct. 1850, 161 L.Ed.2d 727 (2005) (indicating that if an employer's conduct negatively affects an employee's salary, title, position, or job duties, that conduct constitutes an adverse employment action).  Although McGowen's new position of systems engineer of Project ABC was not equivalent to a demotion in terms of pay or grade, this job was subservient to and far less desirable than his job as project engineer in terms of duties, authority, and status.[25] See McCabe v. Sharrett, 12 F.3d 1558, 1564 (11th Cir. 1994) (finding transfer to less desirable job, notwithstanding that there was no decrease in salary, was an adverse action in part because plaintiff's new position involved less responsibility and more menial tasks).

ii.      McGowen's August 1999 evaluation resulted in a tangible, negative effect on his employment when he received only a single, one-time pay-point worth approximately $800.00.   A negative performance evaluation, by itself, does not constitute an adverse employment action.  See Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1261 (11th Cir. 2001).   An evaluation that directly disentitles an employee to compensation of any significance – as occurred in this case – is an adverse action, however.[26]  Gillis v. Georgia Dept. of Corrections, 400 F.3d 883 (11th Cir. 2005) (holding that plaintiff

---

[25] McGowen's reassignment to another branch after returning from sick leave in August 2001 did not constitute an additional adverse employment action. Rather, the move was simply a lateral transfer.

[26] Teer, on the other hand, received a permanent four pay-point award worth $3200.00 per year. It is true that Teer not only worked on Project ABC but also took the lead on other projects as well. Even so, his receipt of this amount demonstrates the potential financial value to CSS employees, including those working Project ABC, of an exemplary evaluation.

established that she suffered an adverse employment action by showing that she received a three percent "met expectations" raise, rather than a five percent raise corresponding to an "exceeded expectations" rating).

8.      The government has met its burden of producing evidence that McGowen was replaced by Teer and received a poor performance evaluation for legitimate, nondiscriminatory reasons.

        a.      Thompson replaced McGowen with Teer as project leader and moved McGowen into the position of systems engineer because, for the legitimate and nondiscriminatory reasons outlined in the court's findings of fact, she determined that additional CSS personnel needed to be assigned to Project ABC and that,  while McGowen was a good engineer with respect to technical matters, he was not an effective administrator.

        b.      Thompson gave McGowen a relatively poor performance evaluation because, based on the legitimate and nondiscriminatory reasons discussed in the court's factual findings, she determined that such an evaluation was warranted.

9.      McGowen has not demonstrated that the government's reasons for removing McGowen as project leader and giving McGowen a relatively poor performance evaluation constitute pretext for unlawful age discrimination.  Contrary to McGowen's contention, the record does not reflect that Thompson lacked knowledge of his administrative skills and history at the time she removed him as project engineer and replaced him with Teer. Moreover, the record does not reflect that CSS had any plan to force older workers to retire or had any policy of hiring only fresh-outs or younger workers to replace older workers. Additionally, it does not reflect that Thompson's conduct, including her relatively poor performance evaluation of McGowen, was an effort to create a work environment so hostile that McGowen would feel compelled to resign and permit the introduction of younger workers.  Furthermore, whether Thompson stepped outside the bounds of her authority or the law in directing McGowen not to provide outside contractors with cost estimates is irrelevant to McGowen's claim of age discrimination.

10.      McGowen has failed to show by a preponderance of the evidence that the

government discriminated or retaliated against him on the basis of age, in violation of the ADEA.  McGowen's claims should therefore be dismissed with prejudice.

For all of the reasons stated above, it is therefore ORDERED:

1.      The government's renewed Motion for Judgment as a Matter of Law Under Rule 52 (memorandum and motion at doc. 40) is GRANTED, with taxable costs to be assessed against McGowen.

2.      Judgment is hereby ENTERED in favor of the government and against McGowen, and McGowen shall take nothing in this action.

**DONE and ORDERED** this 15th day of February, 2006.


_s/ M. Casey Rodgers_

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**